IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| BETSY B. BIELEK, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | No. 2:04-cv-1910 |
| | ) | |
| v. | ) | |
| | ) | Judge Thomas M. Hardiman |
| ALLEGHENY LUDLUM, | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Plaintiff Betsy B. Bielek (Bielek) brought this action against her employer, Allegheny

Ludlum Corporation (Allegheny Ludlum), alleging state and federal claims. On April 21, 2005,

the Court dismissed Plaintiff's state claims, but allowed her federal claims for disability

discrimination, gender discrimination, and retaliation to proceed. After discovery, Allegheny

Ludlum filed a motion for summary judgment on all remaining claims, which is the subject of

this Opinion.

## I.     FACTS

Allegheny Ludlum hired Plaintiff in 1990 to work in its facility in Brackenridge,

Pennsylvania. Because she is a member of the United Steelworkers of America (Union), the

terms and conditions of Bielek's employment were governed by a collective bargaining

agreement between Allegheny Ludlum and the Union. During the first four or five years of her

employment, Bielek worked as a day shift laborer, which included a wide variety of duties. For

about two years thereafter, Bielek worked on the blooming crew in the 8-2 department. In June 1997, Bielek worked on Allegheny Ludlum's railroad, where she performed both conductor and brakeman duties, which involved strenuous lifting, grabbing, and pulling.

## A.    Bielek's Wrist Injury And Workers' Compensation Leave

Prior to September 15, 1999, when she injured her right wrist while working on the railroad, Bielek did not have a disability of any kind. She had no lifting restrictions on either arm and was physically able "to lift 100 pounds or more." On September 15, 1999, Bielek was taken directly to the emergency room of a local hospital, where the doctor diagnosed her as having a wrist sprain.

As a consequence of her wrist injury, Bielek took workers' compensation leave from September 15, 1999 through July 28, 2003 without opposition from Allegheny Ludlum. Indeed, the company filed the claim for workers' compensation benefits on Bielek's behalf. Early in her workers' compensation leave, Bielek treated with Dr. Kabazie, a pain management specialist. Bielek then treated with Dr. Heidenreich, an orthopedic surgeon who found that there was a broken bone in her right wrist. Accordingly, Bielek had two surgeries on her right wrist, followed by physical therapy and occupational therapy, all of which resulted in some improvement. In the Spring of 2000, Dr. Heidenreich imposed a 3-pound lifting restriction on Bielek's right hand.

Three years later, while Bielek remained on workers' compensation leave because of the injury to her right wrist, a fraud investigation videotape showed Bielek playing golf on 18-hole golf courses on at least two occasions. The videotape also shows Bielek carrying items and

2

performing other tasks that exceeded the physical restrictions that she claimed to have on her right hand. As a result of the surveillance videotape, Bielek initially was given a 5-day disciplinary suspension in May 2003. Following a hearing at which the Union and Bielek were present, the suspension was converted into a 15-day disciplinary suspension for misrepresenting her ability to work.

On May 7, 2003, Bielek treated again with Dr. Kabazie, who noted in a report that day: "In regard to her golf, she states that she plays golf because she was told by multiple physicians in the past that she should try to remain as active as possible and feels quite lucky . . . that she is able to play golf enough." Dr. Kabazie released Bielek to return to work and did not impose any work restrictions on her.

Six days later, Bielek saw Dr. Heidenreich, who wrote: "I did, however, note in the office today if she is capable of golfing she is certainly capable of using this [right] hand to work at the minimum in a light duty fashion with this arm." When Bielek tried to get Dr. Heidenreich to say that he previously had told her that she should play golf as a means of rehabilitation, Dr. Heidenreich disagreed, stating: "I do not recall this specific question and did not document that previously."

## B. Bielek Returns To Work In a Modified Duty Assignment On July 28, 2003

On July 28, 2003, Bielek returned to her former position on Allegheny Ludlum's railroad, albeit in a modified duty capacity. Bielek was assigned to work as a general service employee in the transportation and raw materials department, but with a 3-pound weight limit on her right

3

hand only, with sedentary and secretarial work preferred. Bielek had no restrictions whatsoever on her dominant left hand or left arm and testified that she could lift 50 pounds with that arm. Bielek understood that, by "sedentary and secretarial work preferred," her work restriction meant that she could be given work that was not sedentary or secretarial, as long as it was within a 3-pound lifting restriction on her right hand only.

From July 28, 2003 through August 20, 2003, Bielek worked as a general service employee on the 8:00 a.m. to 4:00 p.m. weekday shift. Her supervisor was David Pawlak, whom she first met when she returned to work on July 28, 2003. At the start of each shift, the general service employees (including Bielek) gathered at the general service shanty, where Pawlak would dictate their assignments.

Upon her return to work, Bielek disclosed her work restrictions, including the 3-pound lifting restriction on her right hand, and her doctor's preference that she perform sedentary or secretarial work. During the time that Bielek reported to Pawlak as a general service employee, Pawlak told her at least twice to "work within your limitations." Pawlak also told Bielek "not to do anything that would go against your 3-pound restriction on your right hand" or "beyond what you were physically capable of performing." In addition, Pawlak told Bielek to "take frequent breaks" and Bielek "knew that if [she] wanted a break, [she] could take one." Finally, Pawlak told her to "rest as often as [she] needed." In addition to the foregoing comments, Pawlak's supervisor, Gary Adam (Adam) told Bielek to "work within [her] limitations."

During the time that Bielek reported to Pawlak as a general service employee, he regularly reviewed safety issues and held safety meetings with the general service employees,

4

including Bielek. On several occasions, including on August 20, 2003, Pawlak specifically
reviewed safe job procedures with Bielek, during which he discussed workplace safety. Bielek
also signed various safety forms acknowledging her participation in safety meetings with Pawlak.

Bielek's first assignment as a general service employee was to scrub and wash the walls
in the department's building, which required a step stool to reach the higher parts of the walls.
After Bielek advised that she would have difficulty using the step stool because she would have
to balance herself with her right hand on the wall, Allegheny Ludlum provided her with an
extension pole with a sponge/cloth wrapped around the end of it, so she could reach the upper
parts of the walls without having to use her right hand at all. Bielek's second assignment as a
general service employee was to do filing. She also was assigned to "babysit" a cleanup truck,
which simply required her "to sit and watch and make sure nobody got hurt." The only other
assignments Bielek was given as a general service employee from July 28, 2003 through August
20, 2003 were "[j]ust general, any general assignment, go pick up the wood there, go pick up the
paper here, cleanup, general cleanup." There is no dispute that all of the foregoing assignments
were within the 3-pound lifting restriction on Bielek's right hand. With respect to sedentary or
secretarial work, Bielek admits that, aside from the filing and "babysitting" assignments that she
was given, there was no other sedentary or secretarial work available that she could have been
given.

5

**C.    Following An IME On August 13, 2003, Bielek Was Released To Return To Unrestricted Duty On The Railroad, But Out Of An Abundance Of Caution, Allegheny Ludlum Maintained The 3-Pound Lifting Restriction On Her Right Hand.**

Bielek underwent an independent medical examination by Dr. Steven Kann on August

13, 2003.  Based on his examination, Dr. Kann released Bielek to return to work on unrestricted

full duty as a railroad conductor, with no restrictions on her right hand.  Rather than immediately

return Bielek to an unrestricted position on the railroad, Allegheny Ludlum transitioned her back

to full duty gradually, first by assigning her as an "observer" who was only asked to "go turn the

switches [and] practice getting on and off the train."  On her first morning in that "observer"

position, Bielek tried to turn the switch with her left hand, but was unable to do so and did not

use her right hand to try to turn the switch.  After she failed to turn the switch, Bielek requested a

return to the general service position.  Allegheny Ludlum accommodated Bielek's request and

returned her to the general service position, still with a 3-pound lifting restriction on her right

hand, where she remained until August 20, 2003.

**D.    Bielek Injures Her Left Elbow On The Job On August 20, 2003.**

On August 20, 2003, Bielek injured her left elbow while working in the general service

position.  On that day, Bielek and two other employees, including Ken Boyer (Boyer), were

assigned to clear debris in the yard in advance of a tour of the plant that was to occur around

11:00 a.m.  Allegheny Ludlum provided Bielek with a tool called an Easy Reacher, which weighs

less than three pounds and is designed to make objects easier to lift.  Bielek used the Easy

Reacher with her dominant left hand to pick up debris such as paper and plastic.

6

On the morning of August 20, 2003, Pawlak conducted an individual safety audit of

Bielek during which he reviewed safety procedures and "[j]ust normal general safety, so [she]

wouldn't get hurt." During Pawlak's audit, he observed Bielek picking up scrap and debris and

found nothing wrong with Bielek's left arm at that time. Pawlak then instructed Bielek, Boyer,

and the third worker to clean three areas in anticipation of the plant tour: (i) behind the Number

3 Building; (ii) two pieces of wood at 2 Gate; and (iii) around the Swarf Building. Bielek did not

object when she was assigned to perform these tasks. With respect to the area behind the

Number 3 Building, Bielek testified that something needed to be removed but she could not

move it, so she and Boyer found two other employees to help Boyer pick it up and throw it in the

dumpster. With respect to the two pieces of wood at 2 Gate, Bielek admitted that she "didn't

touch the two pieces of wood."

Regarding the area around the Swarf Building, there were approximately five bricks, each

weighing about seven pounds, that needed to be removed from a concrete slab a few inches off

the street. Of those five bricks, Boyer disposed of three of them while Bielek disposed of the

other two at the same time. Specifically, Bielek grabbed and held one brick with her left hand,

and then used her right hand to slide the second brick onto her left forearm, and then carried the

bricks to the dumpster. Bielek decided to dispose of the two bricks at the same time because her

left arm had no restrictions and lifting two 7-pound bricks at the same time was well within her

physical abilities and should not have been a problem. As Bielek testified: "I didn't think

anything of it, I can lift 50 pounds with one arm. Two bricks shouldn't have hurt."

Bielek disposed of the bricks by rotating her left forearm so the bricks would fall off of her left

7

arm and into the dumpster. When she did so, she felt pain in her left elbow. Bielek then found Boyer and told him that there was something wrong with her left elbow, although she did not mention that the problem was caused by disposing of the bricks into the dumpster. Bielek then rode in a truck to the general service shanty, from where she called Pawlak and told him that she injured her left elbow.

## E. Allegheny Ludlum Arranged For Bielek To Be Seen At The Dispensary And At A Local Hospital.

After Bielek told him that she was injured, Pawlak sent a truck to transport her to the Allegheny Ludlum dispensary, where Bielek told the nurse that she had hurt her elbow when she moved the bricks. The nurse gave Bielek an ice pack, medication, and a sling to immobilize her left arm.

From the dispensary, Bielek was taken to a local hospital by Allegheny Ludlum security. At the emergency room, Bielek would not let the doctor touch her left elbow or do a thorough examination of it because she claimed that it was too painful. An x-ray of Bielek's left elbow was negative, however. Bielek was prescribed pain medication, although she does not remember ever getting the prescription filled. Bielek was also given a sling for her arm.

## F. On August 21, 2003, Bielek Was Sent Home Because She Claimed To Be Totally Disabled And Unable To Work.

On August 21, 2003, Bielek's husband drove her to work in the morning and she reported to the general service shanty. After giving assignments to the other general service employees, Pawlak told Bielek to get into a truck to be taken to the dispensary, as had occurred previously. Nevertheless, Bielek wanted to be transported in Pawlak's car instead of a truck, which she

8

objected to because she later was informed by another employee that the truck was 19 inches from the ground, without accounting for the intermediate step.

Despite complaining about having to ride in the truck on August 21, 2003, Bielek entered the truck, seated herself, and exited the truck at the dispensary, all without assistance. When Bielek arrived at the dispensary, Pawlak told her to proceed to the conference room, where Pawlak, his supervisor Gary Adam, and George Kolesar, Allegheny Ludlum's Safety Director, were in the conference room. Pawlak led the discussion and allegedly told Bielek that they could not understand how she had picked up two bricks at the same time on August 20, 2003 without using her right hand (which supposedly was unable to lift more than 3 pounds). Pawlak asked Bielek to demonstrate how she had picked up two bricks at the same time, from a concrete slab that was a few inches off the ground, without using her right hand. She responded to Pawlak by saying, "I don't know how I did it, I have to think about it."

At the conclusion of the discussion on August 21, 2003, Kolesar told Bielek that Allegheny Ludlum did not have any jobs available for someone with the arm conditions that she claimed to have, and Bielek admits that was a true statement. A truck came to drive Bielek back to the general service shanty, but this time she refused to enter the truck and instead returned to the dispensary and "like a crazy woman was sent to the point of screaming" at the nurse who was there. The nurse responded by saying, "I'll call security, honey, I'll call security," and promptly called security and arranged alternative transportation for Bielek.

Bielek has been on a leave of absence and has performed no work for Allegheny Ludlum since August 20, 2003. Although her benefits have expired according to the terms of Allegheny

9

Ludlum's benefit plans, Bielek is still on the employment rolls at Allegheny Ludlum and has the right to be recalled to work.

## G.     Bielek Claims That She Has Been Entirely Unable To Work Since August 21, 2003, With Or Without Accommodation.

In her deposition, Bielek said that she was physically unable to work on August 21, 2003 and she was unaware of any accommodation that would have enabled her to do so. As of her deposition, Bielek still was unable to work, with or without an accommodation. Bielek applied for and began receiving Social Security disability benefits on February 1, 2004.

On September 27, 2005, three days before discovery ended, Bielek mailed to Allegheny Ludlum additional documents related to her May 18, 2004 application for Social Security disability benefits (SSD Materials). In her SSD Materials, Bielek stated, under penalty of perjury:

> a.     "I became unable to work because of my disabling condition on August 20, 2003";
>
> b.     "I am still disabled";
>
> c.     "I cannot work because of pain in both arms" (emphasis in original); and
>
> d.     "My restrictions for lifting – currently 3 lb. each arm makes it **impossible** to be a steelworker" (quadruple underscoring emphasis in original)).

10

## H.    Bielek's "Expert" Determined That She Can Lift Up To 75 Pounds.

Bielek eventually was diagnosed as having lateral epicondylitis in her left elbow. In June 2004, Dr. Kann conducted an IME of Bielek and determined that she could lift up to 15 pounds with her left arm at that time.

On September 30, 2005, Bielek produced a report prepared by Dr. Russell Gilchrist in which he opines that based on his examination of Bielek during the Spring of 2005, her only work-related restriction would be lifting no more than 75 pounds.

## I.    Bielek Has Not Wanted To Return To Work, Whether Capable Or Not, Since At Least The Spring Of 2003.

In the Spring of 2003, before she was brought back to work after being videotaped playing golf, Bielek told representatives of Allegheny Ludlum that she was not interested in returning to work even in a modified or light duty capacity, but simply wanted to settle her workers' compensation case relating to her September 1999 right wrist injury and move on with her life.

In October 2004, Allegheny Ludlum offered Bielek modified duty consistent with the work restrictions imposed on her by Dr. Kann, but she rejected that offer.

## J.    Bielek Has Not Suffered From A Qualifying "Disability" Under The Law At Any Time Relevant To This Litigation.

At all times before allegedly injuring her left elbow on August 20, 2003, Bielek had no restriction whatsoever on her dominant left hand or left arm because they were fully functional and she could lift 50 pounds with her left arm alone.

11

The condition of Bielek's right wrist and right hand was about the same in March 2003 as it was in August 2003. During a workers' compensation fraud investigation in 2003, surveillance video was obtained of Bielek playing two rounds of golf and engaging in other activities showing that she was exceeding the supposed 3-pound weight restriction on her right hand.

Bielek admits that she is the subject of the surveillance video and that the man who occasionally appears in the video is her husband. She was first videotaped playing a round of golf on April 24, 2003 at the Stonecrest golf course. She also was videotaped playing a round of golf on April 30, 2003 at the Buffalo Valley Country Club golf course.

The surveillance video shows Bielek:

a.   pulling down the gate of her pickup truck with both hands;

b.   leaning her weight on her right arm on the open gate of the pickup truck as she bends down to put on her golf shoes;

c.   lifting a bag containing her shoes with her right hand and placing that bag into the bed of her pickup truck with her right hand;

d.   reaching into the bed of her pickup truck and lifting and moving a large bag in the bed of the truck;

e.   lifting her golf bag, with golf clubs in it, out of the bed of her pickup truck and setting it on the ground;

f.   grabbing a golf club with both hands and making a stretching motion over her head with it, while keeping both hands fixed to the ends of the golf club;

g.   taking full, fast swings and hitting golf balls, with full follow-throughs;

12

    h.      using her right hand to grab the corner of her golf cart as she entered it;

    i.      driving the golf cart and steering with her right hand only;

    j.      "hand-slapping" her husband with her right hand after hitting a golf shot;

    k.      opening the door of her pickup truck with her right hand;

    l.      using both hands to turn the steering wheel of a car;

    m.      lifting two golf bags with golf clubs in them, one after the other, off her golf cart and placing them on the ground;

    n.      lifting the trunk of her car (not the pickup truck) with her right hand only, and then closing the trunk of her car with her right hand only.

Bielek admits that she was physically able to lift her golf bag, with golf clubs in it, with

her left arm in 2003. The surveillance video shows Bielek engaging in, *inter alia*, the following

actions in October 2003, following her alleged injury to her left elbow:

    a.      pulling the door of her pickup truck closed with her left arm only;

    b.      using her left arm only to turn the manual crank to open the driver's side window of her pickup truck;

    c.      talking on a cell phone with her left hand;

    d.      driving away in her pickup truck while simultaneously steering with her right hand only and flipping a cigarette out of the window with her left arm only; and

    e.      carrying three or four large white plastic bags with her right arm containing unknown items from across the street into her house.

13

From 2000 until July 2005 when her daughter moved away, Bielek saw her three grandchildren at least once or twice a week and helped them by: cooking, attending their ball games, picking them up from school when they were sick and taking them to the doctors' appointments, going to the wave pool with them, and caring for them when they were sick, including making soup and giving them their medicine. Bielek also changed their diapers when they were 1½ or 2 years old by putting them onto a bed. She also held and carried her grandchildren.

Since her marriage in 1997, Bielek has been the principal meal preparer in her household and that has not changed since August 2003. When Bielek makes spaghetti and meatballs, she sometimes places the pot full of water on the stove, and sometimes her husband does so. Bielek mixes the spaghetti with sauce in a colander, puts meatballs into the colander, and then uses two forks – one in each hand – and takes the spaghetti, meatballs, and sauce out of the colander and serves them on plates. Bielek is physically able to lift and carry the plates of spaghetti and meatballs from the counter to the table, and was physically able to do so in August 2003.

Bielek also is physically able to prepare fried and baked fish, including carrying her plate with the prepared fish on it from the counter to the table. She can prepare ham steaks, which she does in a frying pan; Bielek is able to turn the ham steak from one side to the other using a fork in her dominant left hand and was physically able to do so in August 2003.

Although she later changed her testimony, Bielek testified that she also prepares roasts by putting them into the oven, with her husband taking them out of the oven. Bielek is physically able to slice onions with her dominant left hand, and was able to do so in August 2003. She can

14

peel potatoes, make homemade soup, including "[p]arboil[ing] the chicken, strip[ping] the
chicken down, strain[ing] it, put[ting] the noodles in, start[ing] over again," as well as lifting and
pouring cans of broth into the pot. In addition, she can ladle soup out of a pot and into cups,
using a ladle with her dominant left hand. Finally, Bielek is physically able to use a coffee maker
to make and pour a cup of coffee.

From March 2003 through the present, Bielek has been able to dress, groom, and
bathe herself. During the relevant period, Bielek vacuumed her house, cleaned hardwood
floors on her hands and knees, dusted, cleaned her oven, cleaned her toilet, and lifted and
carried piles of laundry. In addition, Bielek sometimes goes grocery shopping alone for
smaller orders and is able to lift items from the shelves, place the items into the grocery
cart, push the cart, lift and carry the items to her car, and lift and carry the items into her
home. When Bielek goes grocery shopping by herself, she is physically able to lift and
carry up to "four or so [plastic grocery bags]" with her right arm.

Bielek and her husband have owned a 2000 Ford Ranger pickup truck since 2001. They
also owned a second car until approximately late 2003. Bielek can drive her pickup truck, is able
to open and close its doors, and is able to open and close the gate on the back of the bed. During
August 2003, from April 2003 through August 2003, and prior to April 2003, Bielek was able to
drive both her pickup truck and her second car and was able to open and close the doors and
tailgates of both vehicles.

From at least September 1999 through March 1, 2004, Bielek's husband also worked at
Allegheny Ludlum and was a member of the Union. From July 28, 2003 through August 20,

15

2003, Bielek started her shift at 8:00 a.m. every day and she rode to work with her husband on the days when their shifts coincided. When Bielek's husband's shift did not begin at 8:00 a.m., which was most of those days, she drove herself to and from work.

In September 2003, only weeks after the injury to her left elbow on August 20, 2003, Bielek and her husband changed their residence. In the process of moving to a different house, Bielek packed some of her belongings into boxes, including teacups, Lennox, vases (including vases made of glass), light bulbs, "fragiles," and her toaster. Also during this move, Bielek carried "[a]nything that could be [put] in a plastic bag and lumped on my elbow," and specifically on her right elbow. During the move, Bielek may have carried her lamps, clothes, and cookware, but she is not sure.

Bielek gambles at casinos, plays "slots," and did so in 2003. When she plays the slots, Bielek typically plays the "dollar machines." When she moves from one slot machine to another, she carries the dollar pieces that she has won in a bucket that is approximately four inches in diameter at the base and is wider at the top. When Bielek carries her bucket of dollar pieces from one slot machine to another, her bucket typically contains 1½ inches of dollar pieces in it, and she is physically able to lift and carry that weight.

Finally, Bielek admits that Allegheny Ludlum honestly believes that she is exaggerating her injuries and honestly believes that she is capable of doing more than she claims.

16

## II.    ANALYSIS

The material facts of this case are largely undisputed. After injuring her right wrist in 1999, Plaintiff took workers' compensation leave and told Allegheny Ludlum that she did not want to return to work in any capacity. Although Bielek told Allegheny Ludlum (and the workers' compensation authorities) that she could lift no more than 1 pound with her right hand, a workers' compensation fraud investigator obtained surveillance videotape of her playing rounds golf without any indication of pain in her right wrist, lifting her and her husband's golf bags full of clubs, using her right hand to open and close heavy doors on her pickup truck, and otherwise exceeding the physical limitations that she had claimed. After serving a 15-day suspension for misrepresenting her ability to work, Bielek returned to work in a modified duty capacity, subject to a 3-pound lifting restriction on her right hand. At the time her right hand was so restricted, Bielek's dominant left arm was entirely unrestricted and she was able to lift fifty pounds. Bielek admits that all of her assignments in her modified duty job were within the 3-pound restriction on her right hand. Three weeks later, however, Bielek claims to have injured her left arm while lifting two 7-pound bricks. Bielek claims that she has been totally unable to work since then, with or without accommodation.

Bielek claims that Allegheny Ludlum: (i) failed to accommodate the alleged disability to her right hand under the Americans with Disabilities Act (ADA); (ii) discriminated against her because of her gender under Title VII of the Civil Rights Act of 1964 (Title VII) for allegedly refusing to provide medical treatment to her in 2000; and (iii) retaliated in violation of Title VII by contesting her workers' compensation claim for her left arm injury in 2003, after

17

she had filed a workers' compensation claim for her right wrist injury in 1999.

## A.    **Legal Standard**

Summary judgment is proper when the evidence shows that "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In response to a motion for summary judgment, the nonmoving party must "designate 'specific facts showing there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. "Speculation and conclusory allegations do not satisfy this duty." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).

Summary judgment is required on an issue or a claim when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986); *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). An issue is "material" only if the factual dispute "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

"Summary judgment procedure is properly regarded not as a disfavorable procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (1986) (internal quotation marks omitted). The parties have a duty to present evidence; neither statements of counsel in briefs nor speculative or conclusory allegations satisfy this

18

duty. *Ridgewood Bd. of Educ.*, 172 F.3d at 252 (3d Cir. 1999). After the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The nonmoving party must make a showing sufficient to establish the existence of each element essential to his case on which he will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322-23. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson*, 477 U.S. at 249.

## B. **ADA Claim**

Bielek claims that Allegheny Ludlum violated the ADA "by its refusal to make the reasonable accommodations ordered by her treating orthopedic doctor" when she worked in the modified duty job from July 28, 2003 to August 20, 2003. Those restrictions were "a 3 pound [lifting] restriction on [Plaintiff's] right hand, with sedentary or secretarial work preferred." Bielek had no restrictions on her dominant left arm during that time period and she testified that she could lift fifty pounds with that arm alone.

To state a claim for failure to accommodate under the ADA, a plaintiff must produce evidence that: (i) she has a "disability" for purposes of the ADA; (ii) she can perform the essential functions of the job, with or without reasonable accommodation; and (iii) Allegheny Ludlum failed to make reasonable accommodation for that known "disability." *See, e.g.,Shaner, Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000); *see also* 29 C.F.R.§ 1630.9(a).

19

**1.      Bielek admitted that all of her assignments were within the 3-pound lifting restriction on her right hand.**

During her deposition, Bielek admitted that all of the assignments that she was given from July 28, 2003 through August 20, 2003 were within the 3-pound restriction on her right hand. She also admitted that Allegheny Ludlum provided her with additional reasonable accommodations to perform the assignment of washing the walls, including providing her with a step stool to reach the higher parts of the walls. When Bielek told Allegheny Ludlum that she would have difficulty using the step stool because she would have to balance herself with her right hand on the wall, Allegheny Ludlum provided Bielek with an extension pole with a sponge/cloth wrapped around the end of it, so she could reach the upper parts of the walls without having to use her right hand at all.

Bielek also admitted that her supervisor, Dave Pawlak, interacted with her to make sure that she understood that she was to work within her restrictions and was not to exceed her restrictions. Pawlak told Bielek: "work within your limitations"; "[do] not [] do anything that would go against your 3 pound restriction on your right hand"; "[do] not [] do anything beyond what you were physically capable of performing"; "take frequent breaks"; and "rest as often as you [need to]." Bielek also admitted that Pawlak regularly reviewed safety issues and safe job procedures with her, and she signed forms acknowledging that she attended those safety meetings with him.

20

Even with respect to the "cleanup" assignment Bielek was given on August 20, 2003, which resulted in the alleged injury to her left elbow, she admitted that she was neither asked nor required to do anything that exceeded the 3-pound lifting restriction on her right hand. In particular, of the three areas of the yard that needed to be cleaned that day, Bielek admitted that she did not do any of the cleaning in two of those areas because her co-workers cleaned them. The only task that Bielek actually performed that day was to pick up two bricks and dispose of them in a dumpster. Even though the bricks weighed seven pounds each, Bielek did not exceed the 3-pound lifting restriction on her right hand because she did not use her right hand to lift the bricks. Instead, Bielek decided to pick up the two bricks at the same time with her dominant left hand because their combined fourteen pounds were well within her self-proclaimed ability to lift fifty pounds with her left arm and the two bricks should not have posed a problem. Therefore, Bielek was never asked to perform a task that contravened her lifting restriction and Allegheny Ludlum did not fail to accommodate her.

In sum, the undisputed facts establish that at no time from July 28, 2003 through August 20, 2003 was Bielek asked or required to exceed the 3-pound lifting restriction on her right hand, nor did she actually exceed the 3-pound lifting restriction on her right hand. Moreover, Bielek's argument that Allegheny Ludlum failed to accommodate her by not giving her "sedentary or secretarial" assignments fails because Bielek's doctor noted that such work was preferred, not required. Bielek acknowledged that she could be given work consistent with the 3-pound restriction on her right hand. Bielek also admitted that there was no available sedentary or secretarial work that she was not given. Thus, the 3-pound lifting

restriction on her right hand is the only operative restriction with respect to Bielek's alleged failure to accommodate claim, and that restriction was never exceeded.

## 2. Bielek Is Not "Disabled" As a Matter Of Law.

An independent reason why Bielek's ADA failure to accommodate claim fails as a matter of law is that she was not "disabled" at the time of the alleged failure to accommodate. 42 U.S.C. §12102(2); *see also Marinelli v. City of Erie*, 216 F.3d 354, 359-60 (3d Cir. 2000). As the Supreme Court stated in a seminal case, "merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184, 195 (2002). Rather, one must have an impairment that "substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A).

The regulations promulgated under the ADA define the term "substantially limits" as rendering a plaintiff "unable to perform a major life activity that the average person in the general population can perform," or "significantly restricted as to the condition, manner, or duration under which [the plaintiff] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1); *see also Toyota Motor*, 534 U.S. at 198 (holding that a "substantial limitation" is a limitation that "prevents or severely restricts" an individual from performing a major life activity). The Supreme Court in *Toyota Motor* also held that "major life activities" are "those activities that are of central importance to daily life." *Id.* at 197. Thus, to be substantially limited in a major life activity, "an individual must have an impairment that prevents or severely restricts the individual from doing activities

22

that are of central importance to most people's daily lives." *Id.* at 198.

A plaintiff's burden to establish a protected "disability" under the ADA is a difficult one. In *Toyota Motor*, the Supreme Court held that the foregoing definitions and terms under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Id.* at 197. Even before the Supreme Court issued the *Toyota Motor* decision, the Court of Appeals for the Third Circuit already required strict compliance with the terms of the ADA's definitions, frequently rejecting plaintiffs' claims to protected disability status as a matter of law.. For example, after reviewing its recent decisions, the Third Circuit summarized the stringent requirements for ADA "disabilities" as follows: "we have held only extremely limiting disabilities – in either the short or long-term – to qualify for protected status under the ADA." *Marinelli*, 216 F.3d at 362 (citing authorities).

Moreover, in *Toyota Motor*, the Supreme Court reaffirmed that whether an individual has a protected "disability" under the ADA must be determined on a case-by-case basis and only after an "individualized assessment" of the individual's limitations in his or her own experience. *Toyota Motor*, 534 U.S. at 198-99 (citing *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)). The Court explicitly rejected any attempt by a plaintiff to prove disability status "merely [by] submit[ting] evidence of a medical diagnosis of an impairment." *Toyota Motor*, 534 U.S. at 198.

The relevant time for assessing "disabled" status is the time of the alleged failure to accommodate, *id.* at 202, which in this case is July 28, 2003 through August 20, 2003. Thus, Bielek's subsequent injury to her left elbow is not relevant because it relates to a time period

23

that is outside the scope of her failure to accommodate claim.[1]

Because of her 3-pound lifting restriction, Bielek claims that she is substantially limited in the major life activity of lifting.[2] Initially, the Court notes that the 3-pound limitation on Bielek's right wrist was based on a note from her doctor in early 2000 and Bielek does not know how much weight she could actually lift with her right arm from July 28, 2003 to August 20, 2003. Her claim to be substantially limited in lifting, therefore, is based not on an "individualized assessment" of her actual abilities, but simply on a doctor's note some three years before the relevant time period. According to the Supreme Court, such a doctor's note fails as a matter of law to prove disability status. *Toyota Motor*, 534 U.S. at 198. When the required "individualized assessment" of Bielek's abilities is performed, the undisputed facts, including her numerous deposition admissions, establish that Bielek is not substantially limited in performing any major life activity as a matter of law, including lifting.

First, prior to August 20, 2003, Bielek had no restrictions whatsoever on her left arm. She was videotaped lifting a golf bag in April 2003 and testified that there was nothing wrong with her left arm and she could lift as much as fifty pounds with that arm. Since the Third Circuit has held that a lifting restriction of only ten pounds is insufficiently severe to constitute

---

[1] This is also true because Bielek has averred that since she injured her left elbow on August 20, 2003, she has been unable to work, with or without an accommodation.

[2] The only other activities in which Bielek claims to be substantially limited are sporting activities, such as playing basketball, baseball, softball, swimming, and bowling. Such activities are not "major life activities" on which an ADA claim can be based as a matter of law. *See, e.g., Toyota Motor*, 534 U.S. at 197; *see also Campetti v. Career Educ. Corp.*, No. 02-1349, 2003 WL 21961438, *12 (E.D. Pa. June 25, 2003).

24

a disability as a matter of law, *Marinelli*, 216 F.3d at 364, Bielek's ability to lift fifty pounds certainly renders her not disabled as a matter of law. *See also Buskirk v. Apollo Metals*, 116 F. Supp.2d 591, 597 (E.D. Pa. 2000).

Furthermore, this Court has held that plaintiffs with carpal tunnel syndrome who had no use of their right arms at work and limited use away from work were not disabled under the ADA as a matter of law. *Ouzts v. USAir, Inc.,* No. 94-625, 1996 WL 578514, at *2-6 (W.D. Pa. July 26, 1996). Just as such limitations are not protected disabilities under the law, so too is Bielek's 3-pound lifting restriction on her right hand not a protected disability, particularly when she admits to being able to carry fifty pounds with her left arm. *See also Popko v. Pennsylvania State Univ.*, 994 F. Supp. 293, 297 (M.D. Pa. 1998) (holding that permanent limitations on the use of the plaintiff's right arm did not constitute a protected disability under the ADA). Thus, as a matter of law, Bielek's claim to be unable to lift more than three pounds with her right hand is insufficient to qualify as a disability under the ADA.

It bears noting as well that Bielek's admissions regarding the physical activities that she actually was able to perform during the relevant time period confirm that she does not have a protected disability. Bielek admits that the condition of her right hand was about the same in March 2003 as it was in August 2003. Significantly, the surveillance videotape from April 2003 shows Bielek as a fully functional woman engaging in numerous activities that the average able-bodied person can perform, including: playing rounds of golf, leaning her weight on her right arm, lifting shoes, bags, and other items with her right arm, lifting golf bags full of clubs multiple times, grabbing the corner of her golf cart with her right hand and using it to pull

25

herself around that corner into the seat of the cart, "hand-slapping" her husband with her right hand, steering her golf cart with her right hand only, opening and closing the doors and gates of her pickup truck and another car with her right hand, and steering her pickup truck with her right hand only.

Consistent with the foregoing, Bielek admitted that throughout the relevant time period of July 28, 2003 through August 20, 2003, she was physically able to perform various activities of daily living, such as: caring for her grandchildren in many ways, including holding, carrying, and changing them; preparing and serving meals; performing chores around the house, including cleaning hardwood floors on her hands and knees and cleaning the toilets; shopping for and carrying groceries; driving a pickup truck and manipulating its doors and gates; packing and moving items to a new residence; and carrying buckets of dollar coins when she played the slot machines.

An individual who can perform normal, everyday activities such as the foregoing is not "sufficiently different from the general population such that [s]he is substantially limited in [her] ability to lift." *Marinelli*, 216 F.3d at 364; *Buskirk*, 116 F. Supp.2d at 599; *see also Toyota Motor*, 534 U.S. at 198. Accordingly, Bielek's wrist injury is not a substantial limitation on a major life activity and Allegheny Ludlum is entitled to judgment as a matter of law on Bielek's ADA claim.

## C.    Bielek's Gender Discrimination Claim Fails As A Matter Of Law.

In addition to her ADA claim, Bielek brings a claim for gender discrimination under Title VII. The familiar three-part burden-shifting analysis in employment discrimination cases

was clarified by the Supreme Court in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515-16 (1993); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A plaintiff first must establish a *prima facie* case of discrimination. If she succeeds in doing so, the employer must articulate a legitimate, nondiscriminatory reason for the employment action in question. The plaintiff then must prove that the articulated reason was not the true reason, but rather was a pretext for intentional discrimination. *See, e.g., Hicks*, 509 U.S. at 515-16; *Burdine*, 450 U.S. at 252-56.

### 1.    The *Prima Facie* Case

To establish a *prima facie* case of gender discrimination, a plaintiff must show that she suffered an adverse employment action and that she did so "under circumstances that give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253; *Jones v. School Dist.*, 198 F.3d 403, 411-12 (3d Cir. 1999).

Bielek initially claimed that she suffered an adverse employment action when she was sent home on August 21, 2003 without being permitted to see a dispensary doctor. In her deposition, however, Bielek recanted, stating that she was not claiming that Allegheny Ludlum sent her home on August 21, 2003 without seeing a dispensary doctor because of her gender. Instead, Bielek claimed that the only alleged adverse employment actions on which she was basing her gender discrimination claim were that she was denied medical treatment on two occasions in 2000 by one Mr. Volpe who had nothing to do with Bielek's injury and treatment in August 2003. The two alleged denials of medical treatment in 2000 transpired many more than 300 days prior to the filing of Bielek's EEOC charge on February 26, 2004 and were not

27

mentioned in that charge, which was limited to conduct between August 1-31, 2003.

Accordingly, those two allegations are time-barred, are outside the scope of the charge, and cannot form the basis of Bielek's gender discrimination claim. Without evidence of an adverse employment action transpiring within the actionable time period, Bielek's gender discrimination claim must fail.

Even assuming, *arguendo*, that Bielek suffered an actionable adverse employment action, she cannot state a *prima facie* case because she produced no evidence that any adverse employment action was suffered "under circumstances that give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. When asked to describe the factual support for her vague assertion that she was treated differently from male employees, Bielek answered that she was told so by Union officer Walt Hill. But Bielek admitted that she does not know Hill's basis for making such a statement, she does not know if his statement was true, and admitted that Hill did not say that "male" employees were treated differently, but only that "no one else" was treated like Bielek. Bielek marshaled no other evidence during discovery about how any other employees were treated, let alone any other "similarly situated" male employees. In sum, the scant evidence Bielek has proferred falls far short of the "specific facts" required to oppose a summary judgment motion. *See Celotex*, 477 U.S. at 324; *Ridgewood*, 172 F.3d at 252.

## 2. Pretext

Even had Bielek been able to establish a *prima facie* case of gender discrimination, Allegheny Ludlum still would be entitled to summary judgment because Bielek has produced no evidence by which a factfinder could find that Allegheny Ludlum's nondiscriminatory

28

reason for sending her home on August 21, 2003 without seeing the dispensary doctor was a pretext for intentional discrimination.

Allegheny Ludlum has satisfied its "relatively light burden," *Fuentes*, 32 F.3d at 763, of articulating "some legitimate, nondiscriminatory reason" for sending Bielek home on August 21, 2003 without seeing a dispensary doctor and for why she has not returned to work since then. *McDonnell Douglas*, 411 U.S. at 802. On August 21, 2003 Bielek claimed she was unable to use either arm and was entirely unable to work, and there was no work available at Allegheny Ludlum for someone in such a condition. Moreover, Bielek testified that she has been totally disabled and unable to work, with or without accommodation, since August 20, 2003. Therefore, Allegheny Ludlum's nondiscriminatory reasons are sufficient to rebut any *prima facie* case stated by Bielek. *See, e.g., Fuentes*, 32 F.3d at 765-66.

To survive summary judgment when an employer articulates legitimate, nondiscriminatory reasons for its action, ". . . the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764; *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 495 (3d Cir. 1995). Plaintiff bears "a difficult burden." *Fuentes*, 32 F.3d at 765. Bielek cannot rely on mere speculation as to the motives behind Allegheny Ludlum's actions. After the employer articulates legitimate, nondiscriminatory reasons for its actions, "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255. In response to the employer's nondiscriminatory

29

reasons, a plaintiff must bring forth evidence of such specific ". . . weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Fuentes*, 32 F.3d at 765 (citations omitted).

In the instant case, Bielek has failed to meet her burden because she has produced no evidence that Allegheny Ludlum's nondiscriminatory reason for its actions was a pretext for intentional gender discrimination. Indeed, far from disputing it, Bielek has admitted that Allegheny Ludlum's reason for sending her home on August 21, 2003 was not discriminatory and was true. Bielek has identified no other "adverse employment action" underlying her gender discrimination claim and, even if she were to do so at this late stage, she has produced no evidence that any reason articulated by Allegheny Ludlum for its actions was a pretext for discrimination.

## D.    Bielek's Title VII Retaliation Claim Fails As A Matter Of Law.

Bielek's final claim is for retaliation. Under Title VII, retaliation claims are governed by the same burden-shifting analysis that applies to other claims of discrimination under that statute. *E.g., Weston v. Commonwealth*, 251 F.3d 420, 432 (3d Cir. 2001); *Shaner*, 204 F.3d at 500-01. Thus, Bielek must establish a *prima facie* claim of Title VII retaliation, which includes demonstrating that she engaged in "protected activity" under Title VII, that she suffered an adverse employment action, and that a causal link exists between the two. *Weston*, 251 F.3d at 437.

30

To establish the first element of her *prima facie* retaliation claim, Bielek must establish that she engaged in conduct protected by Title VII. *Robinson*, 120 F.3d at 1299-1300. Bielek claims that she engaged in activity that was protected by Title VII when she filed a workers' compensation claim in 1999. In its April 21, 2005 Memorandum Opinion, the Court allowed Plaintiff's Title VII retaliation claim to survive a motion to dismiss by leaving open the possibility that "filing a workers' compensation claim may be considered 'protected activity' for purposes of Title VII." Mem. Op. at 7 (emphasis added) (citing *Landmesser v. United Air Lines, Inc.*, 102 F. Supp.2d 273, 277-78 (E.D. Pa. 2000)).

*Landmesser* in no way resolves the issue of whether the filing of a workers' compensation claim is a protected activity for purposes of Title VII. In *Landmesser*, plaintiff brought a state law claim of retaliatory discharge for filing a workers' compensation claim. *Landmesser*, 102 F. Supp.2d at 276. In predicting how the Pennsylvania Supreme Court would analyze such a state law retaliation claim, the court predicted it would "adopt the analysis that is already applied in retaliation cases in the federal employment context." *Id.* at 277. Thus, the court simply adopted the three-part burden-shifting framework from Title VII as the proper framework within which to analyze the substantively different state law claim at issue in that case. *Id.* Accordingly, although the court in *Landmesser* found that filing a workers' compensation claim could be "protected activity" in a *state law* retaliatory discharge claim on the basis of Pennsylvania public policy, the court did not hold or even suggest that filing a workers' compensation claim could constitute "protected activity" in the context of a federal Title VII retaliation claim.

31

In Title VII cases, several authorities require that for conduct to be considered "protected

activity" for purposes of a retaliation claim, that conduct must express opposition to unlawful

discrimination under Title VII:

> At a minimum, the allegedly protected activity must express, either
> explicitly or implicitly, opposition to discrimination on the basis of
> some protected characteristic, such as race, gender, age, or
> disability.

*Pawlak v. Seven Seventeen HB Philadelphia Corp.*, No. 99-5390, 2005 WL 696878, *8-9 (E.D.

Pa. Mar. 24, 2005) (citing authorities) (quotations omitted); *see also Abramson v. William*

*Paterson College*, 260 F.3d 265, 287-88 (3d Cir. 2001) (holding that "protected activity" under

Title VII must "express[] [the plaintiff's] opposition to a protected activity under Title VII").[3]

In light of the foregoing authorities, it is incumbent upon Bielek to marshal some

evidence that her 1999 workers' compensation claim constituted protected activity because it

explicitly or implicitly raised opposition to discrimination on the basis of a characteristic

protected by Title VII. The record is devoid of any such evidence. Therefore, Bielek's filing of

her 1999 workers' compensation claim was not "protected activity" for purposes of her

Title VII retaliation claim.

---

[3]     *See also Barber v. CSX Dist. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) (holding that "a person has
engaged in 'protected conduct' when s/he opposes discrimination on the basis of [a protected
characteristic]"); *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 969 (3d Cir. 1978) (stating that an employee
must "oppos[e] allegedly discriminatory practices by his employer" to qualify as protected activity); *cf.*
*Glanzman v. Metropolitan Management Corp.*, 391 F.3d 506, 516 (3d Cir. 2004) ("assuming" that the
filing of a claim for unemployment compensation benefits could be considered "protected activity" in an
ADEA retaliation claim only because that unemployment compensation claim was based upon an
allegation that the plaintiff was terminated because of unlawful age discrimination).

Even if Bielek could overcome the "protected activity" hurdle, her retaliation claim fails for want of an "adverse employment action." Bielek claims that Allegheny Ludlum retaliated against her under Title VII when it contested her 2003 workers' compensation claim, resulting in Bielek receiving sickness and accident benefits rather than workers' compensation benefits. As Bielek admitted, however, the fact that her sickness and accident benefits expired after one year was a function of Allegheny Ludlum's standard policy, not because of retaliation. Moreover, exercising a legal right, as Allegheny Ludlum did in contesting Bielek's workers' compensation claim, cannot constitute an "adverse employment action" as a matter of law. *E.g., Flint v. City of Philadelphia*, No. 98-95, 1998 WL 303727, *5 (E.D. Pa. May 6, 1998) (citing authorities). Also, Bielek has failed to provide any evidence establishing a "causal connection" between the filing of her workers' compensation claim and any alleged adverse employment action taken against her.[4]

Yet another deficiency in Bielek's retaliation claim is that even if she could satisfy the *prima facie* case, she has failed to produce any evidence of pretext. Bielek admitted (i) that she was sent home on August 21, 2003 without seeing the dispensary doctor because there was no work available for her, given her admitted inability to perform any work; (ii) that it was true that there was no work available for her that day; (iii) that she has been entirely unable to work, with

---

[4]     The mere temporal sequence of events is not evidence of causation under the law. Such "*post hoc ergo propter hoc*" attempts to establish causation have been explicitly rejected by the Third Circuit. *E.g., Robinson*, 120 F.3d at 1302; *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) ("[T]emporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive.'"). In this case, the lapse of nearly four years between Plaintiff's first and second injuries is not "unusually suggestive."

or without accommodation, from August 21, 2003 to the present; and (iv) that Allegheny Ludlum honestly believes that her August 2003 injury to her left elbow was not work-related and that she exaggerated the extent of that injury. This belief explains why Allegheny Ludlum exercised its legal right to contest her 2003 workers' compensation claim. In sum, because Bielek produced no evidence that she engaged in protected activity, that she suffered an adverse employment action, that there is a causal link between the two, or that any reason advanced by Allegheny Ludlum was really a pretext for unlawful retaliation, Allegheny Ludlum is entitled to judgment as a mater of law on Bielek's Title VII retaliation claim.

## III.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment as to all remaining counts of Plaintiff's complaint shall be granted.

An appropriate Order follows.


BY THE COURT:


Dated: September 22 , 2006          _Thos M. Hardiman_

                                    Thomas M. Hardiman
                                    United States District Judge


34

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BETSY B. BIELEK, | ) |
| | ) |
| Plaintiff, | ) No. 2:04-cv-1910 |
| | ) |
| v. | ) |
| | ) Judge Thomas M. Hardiman |
| ALLEGHENY LUDLUM, | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## ORDER

AND NOW, this __22ⁿᵈ__ day of September, 2006, upon due consideration of

Defendant's Motion for Summary Judgment (Doc. No. 23) and the responses thereto, it is hereby

ORDERED that the Motion is GRANTED.

The Clerk is directed to mark this case CLOSED.

BY THE COURT:

_Thos M. Hardiman_

Thomas M. Hardiman
United States District Judge